IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:09-CV-80-W

| | | |
|---|---|---|
| NATIONAL DIAGNOSTICS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| DOLLAR GENERAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

THIS MATTER comes now before the Court following a show cause hearing held on March 26, 2010, concerning possible Rule 37 violations. On January 15, 2010, the Court ordered Plaintiff to show cause explaining why Plaintiff delayed over a month in producing documents to Defendant. (Doc. No. 20). In a subsequent order dated February 23, 2010, the Court directed Plaintiff to submit an affidavit indicating the types of files; terms; and whether Plaintiff omitted searching any particular terms when producing documents for discovery. (Doc. No. 23). On March 3, 2010, the Court order Plaintiff to turn over a CD in its possession for an *in camera* review. (Doc. No. 32). This CD contained files that Plaintiff deemed undiscovered and were apparently never produced to Defendant. Based on the parties responses and the record, this Court must now determine whether relief under Rule 37 is appropriate.

Plaintiff National Diagnostics, Inc. ("NDI") and Defendant Dollar General Corporation ("DGC") entered into a written contract for NDI to provide primarily drug testing services. After Defendant terminated its contract with Plaintiff, Plaintiff filed an action in Mecklenburg County Superior Court against Defendant. Plaintiff's main claim was for breach of contract resulting from failure to pay an invoice. NDI invoiced DGC for an administrative fee of $25.00

per out-of-network drug testing that NDI apparently failed to invoice for the previous five-year period from 2003 to 2008. This invoice was forwarded in August 2008 after DGC notified NDI of its intent to end the contractual relationship. DGC disputed this invoice arguing the 2005 price addendum superceded the original contract provision that set forth in a footnote the $25.00 administrative fee for out-of-network drug testing. Defendant removed this matter to the Western District of North Carolina on March 2, 2009.

The issue of Rule 37 violations arose after it became apparent Plaintiff was playing fast and loose with discovery. On December 4, 2009, Defendant's attorney located a former employee of Plaintiff, Mr. Randall Wilson. Mr. Wilson had been Vice President of Operations at NDI and Operations Manager, and was responsible for billing and operations. Defendant learned of Mr. Randall Wilson's identity while taking another deposition during the discovery period. Defendant also learned that Mr. Wilson had been involved in the negotiation of the original contract between Plaintiff and Defendant, and was in charge of preparing the 2005 pricing addendum. During discovery requests submitted by Defendant in August 2009, Plaintiff did not submit Mr. Wilson's name as a person with knowledge of the matters at issue. At no point did Plaintiff supplement its discovery responses to disclose Mr. Wilson's existence.

Through speaking with Mr. Wilson, Defendant learned that Plaintiff had been in contact with Mr. Wilson in recent months. Mr. Wilson had indicated to Plaintiff that he was willing to speak to what he knew about the Dollar General pricing, but Plaintiff did not disclose his identity to Defendant. This fact is confirmed by Mr. Wilson's affidavit submitted to the Court, and Plaintiff's President, Dr. Phillip Greene's, testimony during the show cause hearing.[1] Mr. Wilson also indicated that files existed in Plaintiff's system concerning pricing and billing

---

[1]Dr. Greene admitted that he had spoken to Mr. Wilson, and indicated he may have said something at a very high level, but contended he did not discuss specifics.

Defendant. Defendant did not have these files, so Defendant asked Plaintiff about these documents on December 7, 2009. Plaintiff responded by letter on December 11, 2009, and indicated that Plaintiff's "first reaction was that they could not locate the documents," but that they were "continuing to work on this." (Doc. No. 22-8). During a pretrial conference before the undersigned on December 17, 2009, the parties further discussed Defendant's request that Plaintiff produce documents identified by Mr. Wilson. Mr. Klein, Plaintiff's attorney, agreed to allow Mr. Wilson access to NDI's records. Nonetheless, it was January 8, 2010, three weeks later, before Plaintiff complied. In total, Plaintiff delayed over a month in turning over these documents to Defendant.

Plaintiff maintained that it was Mr. Wilson who had delayed visiting NDI, but the record shows it was Plaintiff who delayed contacting Mr. Wilson and making arrangements for him to visit. In fact, Mr. Wilson had even left a message for Plaintiff's in-house counsel on December 21, 2009, because he had not heard from anyone associated with Plaintiff to make arrangements for his visit. Plaintiff's attorney finally contacted Mr. Wilson sometime around December 30, 2009. On January 7, 2010, Mr. Wilson traveled to NDI to locate and retrieve the documents concerning Plaintiff's billing of DGC. Plaintiff paid Mr. Wilson a consulting fee for his time. The documents were located on the general office network drive and the private drive formally used by Mr. Wilson. These documents were then turned over to Defendant.

After reviewing the documents, Defendant's attorney found that only one of the files had been produced by Plaintiff to Defendant with its initial disclosures. The remaining documents on the CD had not been previously produced to Defendant. One of the files labeled "Proposal.Pricing" contained Mr. Wilson's calculations concerning the pricing and billing for Defendant under the 2005 addendum. This file contained two relevant documents. One was a

spreadsheet labeled "Pricing Worksheet September 2005 Option." This spreadsheet contained an analysis of Defendant's current prices in 2005 and proposed pricing options. The other document in the file was labeled "DG Pricing Cheat Sheet." This document shows prices for Defendant, which were consistent with the pricing addendum and invoices sent by NDI to Defendant, indicating that there was possibly no errors in pricing. After Plaintiff turned over these documents to Defendant, the parties settled the matter. Pursuant to the settlement agreement shared with the Court, the parties agreed that the settlement does not deprive the Court of the authority to issue sanctions, or order other relief, pursuant to the show cause orders.

The Court also wants to note that Plaintiff still did not turn over some documents it had on a separate CD. Plaintiff's attorney had called these files "undiscoverable." The Court reviewed the CD *in camera* and found that most all of the documents were clearly relevant, and any dispute about the relevancy of these documents should have been submitted to the Court for the Court to resolve rather than Plaintiff unilaterally deciding. Many of the documents included spreadsheets with NDI pricing of both DGC and other companies. While some of the information was proprietary, this should have and could have been resolved through a protective order. Based on these facts, it is clear to the Court that Plaintiff engaged in discovery abuses. Accordingly, the Court believes sanctions are warranted to compensate Defendant for its proximately caused damages sustained from the discovery abuses.

The Fourth Circuit has adopted a four-part test for a district court to apply when determining what sanctions to impose under Federal Rule of Civil Procedure 37. "The court must determine: 1) whether the non-complying party acted in bad faith; 2) the amount of prejudice that noncompliance cause the adversary; 3) the need for deterrence of the particular sort of non-compliance, and 4) whether less drastic sanctions would have been effective." Belk

v. Charlotte-Mecklenburg Bd. Of Educ., 269 F.3d 305, 348 (4th Cir. 2001) (citing Anderson v. Foundation for the Advancement, Educ. & Employment of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998).

First, there is evidence of bad faith on the part of Plaintiff shown through a pattern of conduct in failing to disclose the identity of Mr. Wilson in the original discovery requests, Plaintiff's failure to supplement discovery responses, Plaintiff's delay in turning over documents, and Plaintiff's failing to produce some documents altogether. Dr. Greene, President of NDI, testified that he had seen Defendant's interrogatories, but could not explain why Mr. Wilson was not identified as a person having knowledge. Dr. Greene even spoke with Mr. Wilson during the course of litigation, but still failed to turn over his name in a supplemental discovery response. Dr. Greene states that he thought Defendants knew because he acknowledged Mr. Wilson's existence during depositions. Even assuming this is true, at that point, it was too late in the discovery stage to depose Mr. Wilson. Further, Plaintiff was not forthcoming about Mr. Wilson's knowledge or other documents that existed which tended to show that Plaintiff's claim was very weak. Dr. Greene also submitted an affidavit acknowledging he was responsible for the search of NDI's records, along with John O'Hara. Dr. Greene could not adequately explain why numerous documents, many of which were curiously located on the general office network drive and dealt specifically with DGC pricing and billing, were not turned over during the discovery process.[2]

---

[2] Though not directly related to the discovery abuse, there was also pattern of negligent conduct on the part of Plaintiff's counsel in failing to follow the Court's orders. This conduct includes not assisting opposing counsel with what is supposed to be a joint submission of pretrial materials to the Court pursuant to the Court's standing orders (3:07-mc-47) and the Court's Case Management Order entered March 25, 2009, which states "[t]he Court requires... pretrial submissions to be jointly conference." (Doc. 6, Case Management Order, 4(c)). In an attempt to comply with the Court's orders, Defendant submitted its pretrial materials noting Plaintiff had not contributed with the exception of reviewing the joint statement of the case. At the pretrial conference on December 17, 2009, the Court inquired about Plaintiff's failure and graciously allowed the parties to re-submit the pretrial materials with Plaintiff's additions. Even then, there was delay on the part of Plaintiff to submit these materials that went beyond the deadline set by the Court during the pretrial conference.

Considering this, the Court believes NDI was more responsible than Plaintiff's attorney for the discovery abuses, but Plaintiff's attorney, who took this case on a contingent fee and has received no compensation to date, was not entirely free of responsibility. Plaintiff's attorney called some documents "non-discoverable" though a review clearly indicates the documents were relevant, and indeed discoverable.

Plaintiff asks the Court to consider that it turned over the documents in the end, but the Court finds this argument unpersuasive. In the end, Plaintiff did not turn over all documents, as revealed when the Court ordered the unproduced CD to be turned over for an *in camera* review. Plaintiff also asks the Court to consider that it settled this matter and paid a sum to Defendant as a sign of its good faith. While relevant, the Court believes this fee was for the settlement of claims, and not for Defendant's losses incurred resulting from its failure to comply with discovery rules. Moreover, parties cannot circumvent the Court's discretion to award sanctions where appropriate. In addition, this does not change the fact that Plaintiff withheld the identity of Mr. Wilson, failed to turn over some documents, and delayed in producing other documents. Additionally, during the show cause hearing, Defendant's attorney pointed out errors she found in reviewing the Plaintiff's spreadsheet concerning price and billing calculations. These errors are caused when someone manually types over the formulated data in the spreadsheet. These errors were apparent because the Excel program preserves the formula calculation and if a manual change is made, a later viewer can identify this change by reviewing the saved formula. Though not conclusive, this fact also points to bad faith on the part of Plaintiff.

Second, both the failure to disclose Mr. Wilson's identity during discovery and the delay in producing documents and turning them over just before trial was certainly prejudicial to Defendant. Had Defendant been able to depose Mr. Wilson during the discovery period,

Defendant would have known more about the billing arrangement between NDI and DGC. Further, had Plaintiff complied with discovery and turned over all relevant documents, Defendant would have learned that some documents showed that NDI's billing of the Defendant was consistent with the pricing addendum and that the administrative fee of $25.00 did not apply. Plaintiff's failure also deprived Defendant of relying on certain documents during summary judgment and making arguments based on those documents.

Under Fed.R.Civ.P. 37(d)(3), the Court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure...." The Court has reviewed the submission by Defendant detailing its attorney's fees and costs incurred. Based on this information, the Court has considered and determined a lodestar figure by determining the number of reasonable hours expended times a reasonable rate.[3] See Grissom v. The Mills Corp., 549 F.3d 313, 320 (4th Cir. 2008). The Court has determined that $346.50 per hour during 2009 and $360.00 per hour in 2010 is a reasonable rate for Defendant's lead counsel considering she is a partner at her firm, has been a practicing attorney for the past twenty-two years, and is a former two-year law clerk at the North Carolina Court of Appeals.[4] With regard to the associate working on this case, the Court finds that $252.00 per hour during 2009 and $270.00 in 2010 is a reasonable rate considering he has been practicing law

---

[3] To make this determination, the Court has considered the factors this Circuit has adopted in calcuating the "reasonable number of hours" and the "reasonable rate" including: "1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." See Grissom, 549 F.3d at 321 (internal citations omitted).

[4] The Court notes that this is a discounted rate pursuant to the firm's agreement with the Defendant. The Court has used this discounted rate to calculate fees because this amount helps to calculate Defendant's actual losses as a result of Plaintiff's conduct.

for seven years, and is licensed to practice in North Carolina, the District of Columbia, and Virginia. These rates are also consistent with the locality. The Court has further reviewed the charts and numerous invoices submitted detailing Defendant's time broken down by claim and stage in litigation. The Court finds the hours spent on preparing this case is reasonable considering the claims, types of case, and stage of the case. (Docs. Nos. 22, 33). As a direct result of Plaintiff's delay in producing documents in December 2009, Plaintiff incurred $3,704.40 of fees and costs, in connection with arranging those documents to be produced. (Doc. No. 33) With regard to the show cause orders, which resulted from Plaintiff's conduct, Defendant has incurred $33,994.80 of fees and costs. Beyond this, it is difficult to precisely calculate what attorney's fees and costs Defendant incurred as a result of Plaintiff's failure to comply. Plaintiff has estimated, and the Court agrees, that minimum additional attorney's fees and costs are $6,372.60 in connection with depositions taken and time wasted due to Plaintiff's delay and failure to produce documents. (Doc. No. 22). Thus, the Court believes an award of attorney's fees and costs in the amount of $44,071.80 is warranted and is consistent with Rule 37.

Third, the aim of sanctions in this case is intended to compensate Defendant for proximately caused losses sustained and are not intended to be punitive in nature. In fact, the award of attorney's fees and costs here is only a fraction of Defendant's actual attorney's fees and costs. Consistent with this factor, the Court recognizes the need for deterrence of this sort of non-compliance. Here, Defendant has endured lengthy and costly litigation, and Defendant has incurred a large portion of attorney's fees due to Plaintiff's failure to comply with the discovery rules. This Court finds this type of behavior wholly unacceptable. Such conduct thwarts the legal process and skews a party's ability to evaluate their position during the course of litigation. In the case management order of March 25, 2009, the Court makes clear in section 1(d) that if a party

fails to comply in good faith with the initial and supplemental disclosures requirement, that party may be subject to appropriate sanctions pursuant to Rule 37. Supplements not made sufficiently in advance of the discovery deadline put opposing counsel in a position where it is unable to make strategic judgments about whether to pursue follow-up discovery concerning the witness or exhibit disclosed.

Fourth, less drastic sanctions would not be effective here. Ultimately, once the documents were produced, Plaintiff soon agreed to settle this matter. The Court has considered less drastic sanctions, but given the stage of this matter, the only way to compensate Defendant's losses is to award attorney's fees and costs that proximately resulted from Plaintiff's actions.

After due consideration of these above factors, the Court awards Defendant attorney's fees and costs in the amount of $44,071.80. Therefore, Plaintiff is ORDERED to pay $44,071.80 in attorney's fees and costs which resulted from Plaintiff's failure to comply with the discovery rules in accordance with Rule 37.

IT IS SO ORDERED.

Signed: April 3, 2010

Frank D. Whitney
United States District Judge